# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| Melvin Roberson, | § | |
| | § | Civil Action No. 3-13-cv-0954-N |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| Lear Corporation and | § | |
| UAW Local 129, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## DEFENDANT LEAR CORPORATION'S BRIEF
## IN OPPOSITION TO MOTION TO VACATE ARBITRATION AWARD

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION....................................................................................................1

RELEVANT CONTRACT PROVISIONS...............................................................2

RELEVANT SHOP RULES ...................................................................................2

STATEMENT OF FACTS......................................................................................3

    I.  Background. ..............................................................................................3

    II. Plaintiff And Robertson Get Into Two Serious Fights. ..........................3

    III.Lear Learns About The Fights And Contacts The Police. .....................5

    IV.Lear Investigates The Fights...................................................................6

    V.  Lear Discharges Plaintiff And Robertson................................................9

    VI.The Arbitration Hearing. ........................................................................9

    VII.   The November 26, 2012 Decision Of Arbitrator Fagan. .........................10

ARGUMENT..........................................................................................................12

    I.  Plaintiff Has Submitted No Evidence Establishing That The UAW Breached
       Its Duty Of Fair Representation.............................................................13

    II. Plaintiff has submitted no evidence establishing that Lear breached the
       collective bargaining agreement. ...........................................................15

CONCLUSION AND PRAYER FOR RELIEF......................................................18

Troy_712143_1

## TABLE OF AUTHORITIES

**Cases**

*Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65 (1991)............................................................13

*Bache v. AT and T*, 840 F.2d 283 (5th Cir. 1988) ..................................................13

*Bell Aerospace Co. Div. of Textron v. Local 516*, 500 F.2d 921 (2nd Cir. 1974) ........................17

*Connally v. Transcon. Lines*, 583 F.2d 199 (5th Cir. 1978) ........................................................13

*Del Costello v. Int'l Brotherhood of Teamsters*, 462 US 151 (1983) .........................................13

*Delta Queen Steamboat Co. v. District 2 Marine Eng'rs Beneficial Ass'n*, 889 F.2d 599 (5th Cir. 1989) ........................................................................................................................15

*Gibson v. United States Postal Service*, 380 F.3d 886 (5th Cir. 2004) .........................................13

*Landry v. The Cooper/T. Smith Stevedoring Co., Inc.*, 880 F.2d 846 (5th Cir. 1989)....12, 13, 15

*Major League Baseball Players Assoc. v. Garvey*, 532 U.S. 504 (2001) ....................................15

*McNair v. United States Postal Service*, 768 F.2d 730 (5th Cir. 1985) ........................12, 15

*Teamsters, Local Union 657 v. Stanley Structures, Inc.*, 735 F.2d 903 (5th Cir. 1984) .............17

*United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29 (1987) .........................................15

*United Steelworkers of Am. v. Rawson*, 495 U.S. 362 (1990) ...................................................13

*Vaca v. Sipes*, 386 U.S. 171 (1967) ...........................................................................................13

**Federal Rules of Evidence**

FRE 403 .......................................................................................................................................17

**Statute**

29 U.S.C. § 1985 ....................................................................................................................12, 13

**Treatise**

F. Elkouri & E. Elkouri, *How Arbitration Works* 15-63 (7th ed. 2012) ......................................17

Troy_712143_1

## INTRODUCTION

On February 17, 2011, Plaintiff Melvin Roberson and his co-worker Darrin Robertson engaged in two violent fights that left both of them with serious injuries. Plaintiff instigated the first fight, during which he choked Roberson. Plaintiff actively participated in the second fight, during which he stabbed Robertson with a knife. After an exhaustive investigation, Defendant Lear Corporation ("Lear") discharged both employees effective March 3, 2011.

Defendant UAW Local 129 ("UAW") filed a grievance on Plaintiff's behalf. On August 22, 2012, Lear and the UAW arbitrated Plaintiff's discharge before Arbitrator Joseph J. Fagan. The UAW was represented by two, experienced International Representatives. The UAW rigorously cross-examined Lear's witnesses, objected to the introduction of certain evidence, called Plaintiff as a witness to tell his side of the story, and introduced evidence in support of its position. On November 26, 2012, Arbitrator Fagan issued his written decision in which he concluded Lear had just cause to discharge Plaintiff.

An aggrieved employee like Plaintiff ordinarily does not have standing to challenge an arbitrator's decision issued pursuant to a collective bargaining agreement's grievance-arbitration procedure. To fall within the sole exception to this rule, Plaintiff must demonstrate both that the UAW breached its duty of fair representation and that Lear breached the collective bargaining agreement. Plaintiff, however, has not proven either element. To the contrary, the evidence demonstrates that the UAW vigorously advocated on Plaintiff's behalf, and that Lear had just cause to discharge Plaintiff (and Robertson) for engaging in two fights that left both employees with serious injuries. Plaintiff's Motion to Vacate Arbitration Award, therefore, should be denied.

Troy_712143_1

## RELEVANT CONTRACT PROVISIONS

### ARTICLE 3

### Management Rights

### Section 2: Sole Right to Discipline for Cause

The Company retains the sole right to discipline and discharge employees for cause, provided that in the exercise of these rights it will not act wrongfully or unjustly or in violation of the terms of this Agreement.

### Section 4: Shop Rules

The Company shall have the right to establish shop rules and policies from time to time that are not inconsistent with the provisions of this agreement . . . .

### ARTICLE 5

### Grievance Procedure

### Section 5: Power of Arbitrator

The Arbitrator shall not be empowered to add to, subtract from, or change any of the terms of this Agreement . . . . The Arbitrator shall have jurisdiction only to interpret, apply and determine compliance with the provisions of this Agreement and to modify the degree of discipline imposed by the Company, insofar as the Arbitrator may deem necessary for the determination of the grievance appealed to them . . . . The Arbitrator shall have no power to substitute his/her discretion in cases where the Company is given sole discretion to act by this Agreement or any supplement or amendment thereto.

### Section 12: Disciplinary Layoffs and Discharges

The Company agrees that any disciplinary action that is older than twelve (12) months will not be utilized for progression in the normal disciplinary process.

## RELEVANT SHOP RULES

Committing any of the following violations will be sufficient grounds for disciplinary action from a documented counseling (DC) to immediate termination (Term), depending on the seriousness of the offense in the judgment of management.

10.    Possession of weapons on company premises at any time.

25.    Fighting on the premises at any time.

Troy_712143_1

# STATEMENT OF FACTS

## I.     Background.

Lear is a first tier automotive supplier. (Appx. at 143). Lear employed Plaintiff at its Arlington, Texas facility. At the Arlington facility, Lear manufactures automobile seats on a just in time basis for General Motors Corporation. *Id.* The hourly employees at the Arlington facility, including Plaintiff, are represented by the UAW and their terms and condition of employment are governed by a collective bargaining agreement ("CBA") that includes a mandatory grievance-arbitration procedure (Article 5). (Appx. at 262). At the Arlington facility, Lear provides an office for the UAW's use.

Plaintiff was a committee person (steward) on the first shift. On the first shift, Plaintiff's regular work hours were from 5:30 a.m. to 4:30 p.m.

## II.    Plaintiff And Robertson Get Into Two Serious Fights.

On February 15, 2011, Darrin Robertson complained to Plaintiff about CC Hanchette, an alternate Committee Person, being off line "all the time" on purported union business. (Appx. at 56-57. Plaintiff told Robertson to "get the f- out of my face." (Appx. at 57). Plaintiff also slapped Robertson's hand away when Robertson placed his hand on Plaintiff. (Appx. at 148). Neither Plaintiff nor Robertson reported the incident to Lear management.

On February 17, 2011, shortly before 8 a.m., Plaintiff and Robertson exchanged words outside the Union's office. (Appx. at 24, 62, 64-65). Warren Hawkins, the UAW's President, Jerrick Drayden, a Committee Person, Tirrelle Evans, a co-worker, and Maverick Gayden, the UAW plant Chairperson, were also present. (Appx. at  24). Without warning, Plaintiff escalated the verbal exchange by attacking Robertson and choking him. (Appx. at 24, 64-65). As Robertson explained: "And then that's when he grabs me and puts me in a full nelson like this.

He slams me up against the locker, and then he slams me up against the Union door." (Appx. at 65). Hawkins similarly testified that Plaintiff "proceeded to choke Darrin" and "grabbed him [Robertson] up around his neck." (Appx. at 24). Gayden told Plaintiff to stop choking Robertson. (Appx. at 65-66). Eventually, Hawkins, Evans and Gayden broke up the fight. (Appx. at 24, 65). According to Plaintiff, he left with Drayden and allegedly went to the cafeteria. (Appx. at 186-187). Robertson left with Evans and went to his locker and then his car. (Appx. at 66-67). No one from management witnessed the fight. (Appx. at 24-25). Even though the fight was witnessed by the UAW's President (Hawkins), Chairman (Gayden), and two Committee Persons (Plaintiff and Drayden), and even though the plant superintendent, Vic Patterson, and various front line supervisors were in the facility, no one from the UAW, including Plaintiff, reported the fight to Lear management. Neither did Robertson. As Hawkins candidly admitted, the UAW did not report the matter to management because it did not want either employee to get into trouble: "Well, the thing was – since it was nothing but Union members involved – so I figured we would just squash it right there because – well, Management wasn't around or anything like that, so we just squashed it right there." (Appx. at 24-25).

At approximately 8:08 a.m., Robertson walked past Plaintiff at the front of the shop floor in an area known as the front rail.[1] (Appx. at 67). As Robertson walked by, he asked "Melvin, why did you choke me like that?" *Id.* Plaintiff lunged at Robertson and Robertson punched Plaintiff in the face. (Appx. at 67-68). Plaintiff, in turn, stabbed Robertson with a knife in his left shoulder. (Appx. at 68, 71). Two hourly co-workers, Kirk Price and Larry Watkins, broke up the

---

[1] According to Watkins, right after he clocked in, he heard "people hollering" and saw Plaintiff and Robertson fighting. (Appx. at 44). His time card indicates that he punched in at 8:08 a.m. (Appx. at 418).

Troy_712143_1

fight.[2] Price grabbed Plaintiff and Watkins grabbed Robertson. (Appx. at 44, 52-53). In the course of breaking up the fight, Price heard Robertson say: "oh, you're going to stab me now." (Appx. at 53). Watkins similarly heard Robertson make a statement about Plaintiff stabbing him. Specifically, as Watkins was facing Robertson and holding him back, Watkins saw blood in Robertson's hair and he heard Robertson say: "you [Plaintiff] trying to stab me." (Appx. at 44-45). As Watkins explained, upon hearing Robertson's statement: "I looked around, you could just see the – you know, the knife was just on the ground. You could see the knife on the ground. So that's when I just stepped back." (Appx. at 45).

Hawkins was in the area of the fight. (Appx. at 29-30). Hawkins saw Plaintiff at the rail and Robertson walking back to his station. (Appx. at 29). As Hawkins turned to walk away, he heard Robertson ask Plaintiff "why he choked him." (Appx. at 30). When he turned around, Plaintiff and Robertson were on the floor. *Id.* By the time Hawkins returned to the area, the fight was being broken up. (Appx. at 30). When he looked down, he saw a pocket knife on the ground. (Appx. at 31).

### III.     Lear Learns About The Fights And Contacts The Police.

Ryan Brueckner, the Human Resources Director, and Shane Luxton, the plant's Assistant Human Resources Manager, were sitting in Luxton's office when they learned of the fight. (Appx. at 90, 155). Brueckner and Luxton immediately went out onto the shop floor to the area in which the fight had occurred. (Appx. at 92, 155). As Brueckner testified, when they arrived "there was blood everywhere. There was a handprint of blood on the door. There was blood on the pedestrian side of the aisle. There was blood on the forklift side of the aisle. There were guys

---

[2] The UAW obtained statements from Price and Watkins, but consistent with its refusal to cooperate, it refused to provide Lear with a copy of these statements. (Appx. at 10). Accordingly, Lear subpoenaed Price and Watkins (along with Hawkins) to testify at the hearing.

with blood on their shirts. It was more blood than I had seen in one spot." (Appx. at 155-156). Brueckner was "shaken" by what he saw. (Appx. at 156).

The scene "was very chaotic." (Appx. at 93). Lear was "trying to determine what exactly took place, who was involved." *Id.* Lear "immediately tried to assess the situation, see who was hurt and try to make sure people were safe." *Id.*

Initially, Brueckner did not know that Robertson had been stabbed, but based on the amount of blood, he realized that something "significant" and "violent" had happened. (Appx. at 157). At some point, Brueckner learned that "there was a stabbing." *Id.* Because this violent incident was "beyond the scope" of the workplace incidents that Lear normally handles, and because employees were talking about a stabbing, Lear contacted the police. *Id.* As Brueckner explained, although in the course of his career he had dealt with fights, he had never dealt with "a fight that led to what could have been a life-threatening situation with a knife." (Appx. at 157-158).

When the police arrived, they immediately began to investigate the matter. (Appx. at 159). The police spoke to several employees and obtained statements from some of them, including Hawkins. (Appx. at 159-160, 386). Lear representatives were permitted to sit in on some, but not all, of the police interviews. (Appx. at 160).

## IV.    Lear Investigates The Fights.

While the police investigated any possible criminal violations, Lear investigated "on the employment side." (Appx. at 161). On the day of the fight, in addition to sitting in on some, but not all, of the police interviews, Brueckner also attempted to obtain a statement from Gayden, but Gayden "refused to answer any questions that [Brueckner] asked." *Id.*

Troy_712143_1

Before the police arrived, Robertson went to the hospital to treat his stab wound to his left shoulder. (Appx. at 70-71). Robertson received eight stitches. (Appx. at 71). Keith Harrell, the Health & Safety Manager responsible for investigating workplace accidents and injuries, went to the hospital. (Appx. at 141-142). Harrell obtained a statement from Robertson and took pictures of Robertson's stab wounds. (Appx. at 72-73, 325-329, 376-378).

Given the violent nature of the fight, Lear suspended Plaintiff and Robertson pending further investigation and instructed them that they were not permitted on company property. (Appx. at 98, 295, 299). Harrell verbally notified Robertson about his suspension pending further investigation. (Appx. at 72, 87-88, 141). Brueckner verbally notified Plaintiff who was still at the plant. (Appx. at 163. Lear followed up the verbal notification with a written notification reiterating that they were "suspended pending the outcome of the Company's investigation." (Appx. at 295, 299). At that point, Brueckner had not reached any final determination about either employees' responsibility for the fight or their possible discipline. (Appx. at 241-242).

For the next few weeks, Luxton, with some participation from Brueckner, conducted a thorough investigation into the two fights between Plaintiff and Robertson. Luxton obtained a copy of Hawkins' written statement to the police. (Appx. at 386). Luxton also interviewed several employee witnesses, including Evans and Drayden. (Appx. at 96, 366-368, 374-375). Gayden was present for all of Luxton's employee interviews and had the opportunity to ask and did in fact ask questions of the employees. (Appx. at 99, 132). Evans confirmed that Plaintiff and Robertson fought outside the UAW office. (Appx. at 100, 366-368). Initially, Evans stated that Plaintiff placed Robertson in a chokehold, but upon rereading his statement, Evans look scared and asked to change the wording to say that Plaintiff and Robertson were entangled. *Id.* As for Drayden, notwithstanding his obligations as a Committee Person to cooperate in a company

7

Troy_712143_1

investigation, he provided Luxton with a smart aleck, blatantly false statement in which he claimed there was no physical contact between Plaintiff and Robertson outside the UAW's office, a claim that was contradicted by every witness, including Plaintiff and Robertson. (Appx. at 374-375).

Luxton also gave Plaintiff and Robertson the opportunity to provide a statement regarding the two fights. (Appx. at 297, 303). Given the violent nature of their confrontation, Luxton did not meet with them at the plant. Instead, Luxton gave Plaintiff and Robertson the same two options: (1) to provide a verbal statement via telephone; or (2) to submit a written statement. (Appx. at 102, 297, 303).

Robertson chose to provide a verbal statement via telephone. (Appx. at 104). As with the other employee interviews, Gayden was present on the telephone call with Robertson. (Appx. at 105). Robertson credibly informed Luxton that Plaintiff started the first fight by placing Robertson in a chokehold. (Appx. at 106, 341-350). As for the second fight, Robertson candidly admitted he struck Plaintiff first. *Id.* Robertson also described the stab wounds he suffered at the hand of Plaintiff. *Id.*

Unlike Robertson, Plaintiff provided a written statement rather than an oral statement. (Appx. at 415-416). As Plaintiff admitted during the hearing, because of the "pending criminal charges, I gave them a written statement." (Appx. at 202-203). Plaintiff did not address the first fight in his statement. (Appx. at 415-416). As for the second fight, Plaintiff stated that Robertson "returned through the West-Side Employee Entrance" and "approached me with his hands in his pockets and, without provocation, began to physically assault me." *Id.* His written statement contradicted his testimony at the hearing that he "never saw him [Robertson] come through that

door" and that the first time he saw Robertson was when he turned around and was struck by Robertson. (Appx. at 188, 193, 206-207).

## V.     Lear Discharges Plaintiff And Robertson.

At the conclusion of the investigation, Luxton provided Brueckner with a package of documents that included a timeline of events, the witness statements and other related documents. (Appx. at 97-98, 166, 330-417). After considering all of the evidence obtained by Luxton and himself, Brueckner concluded that Plaintiff instigated a "violent act" outside of the UAW office in which Plaintiff placed Robertson in a chokehold. (Appx. at 168). As for the second fight, Brueckner concluded that Robertson instigated a "second act of violence" by punching Plaintiff in the face. *Id.* Brueckner also determined that the circumstantial evidence supported the conclusion that Plaintiff stabbed Robertson during the second fight. *Id.* Finally, Brueckner determined that neither Plaintiff nor Robertson reported their first fight to management. *Id.* Accordingly, Brueckner discharged Plaintiff and Robertson for their violent fights on company premises. (Appx. at 168-169, 298, 304).

## VI.     The Arbitration Hearing.

On August 22, 2012, Lear and the UAW conducted an arbitration hearing over Plaintiff's discharge before Arbitrator Joseph J. Fagan. Lear was represented by the undersigned counsel. The UAW was represented by Frank Inman, a retired International Union Representative, and J.B. Brown, the Region 5 International Representative.

Arbitrator Fagan placed the burden of proof on Lear. (Appx. at 253). In his defense of Plaintiff, Inman made an opening statement, Appx. at 182; thoroughly cross-examined every witness called by Lear in an effort to discredit the witnesses' testimony, Appx. 1-244; and called Plaintiff as a witness and provided him the opportunity to tell his version of the two fights, Appx.

at 183-236. In addition to attacking the substance of the allegations, Inman also argued that Lear did not properly investigate the two fights or provide Plaintiff with industrial due process. (Appx. at 182-183).

Inman also objected to the introduction of certain evidence and testimony throughout the hearing. For example, at the hearing, Lear sought to introduce Plaintiff's past disciplinary record. (Appx. at 107). Inman objected that such records were not relevant. *Id.* Lear explained that the records were relevant, in part, to counter any argument by the UAW that mitigating factors warranted a reduction in the discharge penalty. (Appx. at 107-113). Arbitrator Fagan asked if anything in the CBA precluded the use of such records. (Appx. at 111). In response, Inman cited the following provision from Article 5, Section 12 of the CBA: "The Company agrees that any disciplinary action that is older than twelve (12) months will not be utilized for progression in the normal disciplinary process." (Appx. at 265). Lear argued that this provision did not apply, because Lear was offering the disciplinary records to counter a mitigating factors argument and not for progression in the disciplinary process. (Appx. at 111-112). Arbitrator Fagan admitted the records subject to his later review and interpretation of Article 5, Section 12. (Appx. at 113).

VII.    **The November 26, 2012 Decision Of Arbitrator Fagan.**

Arbitrator Fagan issued his decision on November 26, 2012. Arbitrator Fagan held that Lear had cause to discharge Plaintiff and, therefore, he denied the grievance. (Appx. at 254).

In the Statement of Facts, Arbitrator Fagan concluded during the first fight on February 17, 2011, Plaintiff "grab[bed] Darren Robertson and put him in a choke hold of some sort. . . . There is no doubt from the arbitration testimony that this altercation took place." (Appx. at 247). Arbitrator Fagan also concluded that while it was "unclear how the [second] fight started . . . there [was] again no doubt from the arbitration testimony the fight took place." (Appx. at 248).

With respect to the second fight, Arbitrator Fagan determined that the witnesses observed a knife on the floor and "[b]oth men were injured. The Grievant [Plaintiff] sustained a laceration to the head (Union #1 [Appx. at 419]) which required three (3) staples. Darren Robertson required eight (8) stitches (Company #5 [Appx. at 325-329) to close a knife wound to the shoulder." (Appx. at 248).

Arbitrator Fagan relied on a 7 factor test as a guide to determine whether Lear had just cause to discharge Plaintiff. (Appx. at 251). Applying this 7 factor test, Arbitrator Fagan held as follows:

1.     Based on the Work Rules, Plaintiff's past disciplinary record, and his experience as a UAW representative, Lear had forewarned Plaintiff of the disciplinary consequences of his conduct. (Appx. at 251-252).

2.     The Work Rule prohibiting fighting was reasonably related to the efficient and safe operation of Lear's business and the performance Lear might properly expect from Plaintiff. As Arbitrator Fagan noted: Lear had "a duty to provide a safe and harassment free workplace for all employees." (Appx. at 252).

3.     Before disciplining Plaintiff, Lear, through Brueckner and Luxton's investigation, attempted to determine whether Plaintiff had, in fact, violated the Work Rules. According to Fagan: There was "no doubt two (2) altercations took place which were in violation of the 'General Work Rules.'" (Appx. at 252).

4.     Lear conducted a fair and objective investigation, in part, because "enough layers of management reviewed the disciplinary action." (Appx. at 252).

5.     Lear obtained a preponderance of the competent evidence or proof that Plaintiff was guilty as charged. "The evidence was reviewed. Witness statements were taken, and again, there was no disputing the two (2) altercations took place." (Appx. at 252).

6.     Although there was some testimony that Lear had not previously terminated employees for fighting, there "was no testimony an altercation of this severity had ever taken place in the plant." (Appx. at 253).

7.     The degree of discipline imposed by Lear was reasonably related to the seriousness of Plaintiff's proven offense and the record of his service to Lear. According to Fagan: "The Grievant [Plaintiff] was a fourteen (14) year employee, with no evidence or testimony at the hearing that his job skills were less than

expected by the Compay. However, the Grievant had a history of being confrontational with both management and other employees." (Appx. at 253).

Arbitrator Fagan also addressed the procedural defenses raised by the UAW and concluded that Plaintiff's "due process was not compromised by the methods used to investigate the incident." (Appx. at 253).

Based on his factual conclusions and application of the above 7 factor test, Arbitrator Fagan concluded that Lear had just cause to discharge Plaintiff:

> The fact remains two (2) altercations took place February 17, 2011, at the Lear plant. The second altercation resulted in injuries requiring hospital treatment for both employees. The Grievant [Plaintiff] initiated the first altercation, and actively participated in the second altercation. Workplace violence has become a serious issue; companies have a duty to provide a violence free workplace for all employees. (Appx. at 253).

## ARGUMENT

An aggrieved worker whose employment is governed by a collective bargaining agreement that provides a mandatory, binding grievance procedure and that gives the union the exclusive right to pursue claims on behalf of aggrieved employees "normally lacks standing independently . . . to attack in court the results of the grievance process." *McNair v. United States Postal Service*, 768 F.2d 730, 735 (5th Cir. 1985). The sole exception is where the employee brings a hybrid Section 301 claim in which he must "prove that the union breached its duty of fair representation and that the employer breached the collective bargaining agreement."[3] *Id.* Regardless of whether the action is brought against the employer, the union or both, "both

---

3 Section 301 of the Labor Management Relations Act "provides an employee with a federal cause of action against his employer for breach of a collective bargaining agreement." *Landry v. The Cooper/T. Smith Stevedoring Co., Inc.*, 880 F.2d 846, 850 (5th Cir. 1989). The courts have implied an employee's cause of action against his union for breach of the duty of fair representation from the statutory scheme of federal labor law. *Id.* "Because of the intricate relationship between the duty of fair representation and the enforcement of a collectively bargained contract, the two causes of action have become 'inextricably interdependent' and known as a 'hybrid § 301/fair representation' suit."

Troy_712143_1

elements must be proven." *Gibson v. United States Postal Service*, 380 F.3d 886, 889 (5th Cir. 2004). Plaintiff has proven neither element. His Motion to Vacate, therefore, must be denied.

I.    **Plaintiff Has Submitted No Evidence Establishing That The UAW Breached Its Duty Of Fair Representation.**

To state a hybrid Section 301 claim arising out of allegedly deficient union representation, an employee must demonstrate that the union's acts or omissions during the grievance process were "arbitrary, discriminatory, or in bad faith." *Connally v. Transcon. Lines*, 583 F.2d 199, 202 (5th Cir. 1978); *see also, Vaca v. Sipes*, 386 U.S. 171, 190 (1967)(holding same). "A union's actions are arbitrary only if, in light of the union's actions, the union's behavior is so far outside of a 'wide range of reasonableness' as to be irrational." *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 67 (1991). A showing of negligence on the part of the union does not establish arbitrariness. *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 372-373 (1990). Neither does a showing of a "mistake in judgment." *Landry*, 880 F.2d at 852. Indeed, the Fifth Circuit has "upheld a determination that a union did not breach its duty when its conduct in processing an employee's grievance was 'less than enthusiastic' and 'not perfect.'" *Id.* (quoting *Connally*, 583 F.2d at 202-203). To avoid dismissal, then, Plaintiff must prove that the UAW's "conduct was arbitrary, discriminatory, or in bad faith, so that it undermined the fairness or integrity of the grievance process." *Landry*, 880 F.2d at 852. Plaintiff has not met his burden.

Plaintiff's sole allegation against the UAW is that "Arbitrator Fagan and representative J.B. Brown of UAW agreed to have plaintiff's National Labor Relations Board complaints dismissed in order to facilitate a biased and apparently corrupt Arbitration proceeding." (Pl.'s

---

*Bache v. AT and T*, 840 F.2d 283, 287-288 (5th Cir. 1988)(quoting *Del Costello v. Int'l Brotherhood of Teamsters*, 462 US 151, 164-165 (1983)).

Troy_712143_1

Mot. at ¶¶ 7 (a) & (b). Plaintiff has not submitted any evidence of this alleged agreement between Arbitrator Fagan or Brown. He also has not proven or explained how this alleged agreement facilitated a "biased and apparently corrupt" arbitration proceeding. Instead, in support of his allegation, Plaintiff has attached as Exhibit B to his Motion a February 26, 2013 letter from the National Labor Relations Board dismissing Plaintiff's unfair labor practice charge in Case No. 16-CA-027476 (the "ULP Charge"). Plaintiff filed the ULP Charge on June 8, 2010, more than eight months **before** the February 2011 altercations that led to his discharge. (Appx. at 420). The ULP Charge, therefore, had nothing to do with Plaintiff's discharge and the arbitration over his discharge. Accordingly, the dismissal of the ULP Charge does not raise an inference that the UAW breached its duty of fair representation with respect to Plaintiff's discharge.

Additionally, the undisputed evidence proves that the UAW complied with its duty of fair representation. First, the UAW appealed the grievance over Plaintiff's discharge to arbitration. Second, at the arbitration hearing, the UAW did not simply go through the motions or provide a perfunctory defense. Rather, the UAW vigorously advocated on behalf of Plaintiff. The UAW advocate, for example, thoroughly cross-examined each of Lear's witnesses and attempted to cast doubt on their testimony. The advocate also objected to Lear's introduction of certain evidence, including Plaintiff's past disciplinary hearing. Finally, the advocate offered alternative theories about why Lear did not have just cause to discharge Plaintiff. Specifically, through Roberson's testimony, the advocate introduced evidence disputing the events surrounding the two altercations, and he introduced evidence asserting that Lear did not follow due process in its investigation of the altercations and its decision to discharge Plaintiff. While the Arbitrator ultimately ruled against the UAW and sustained the discharge, the fact that the UAW lost the arbitration does not mean it breached its duty of fair representation.

In summary, Plaintiff's Motion is devoid of any evidence that the UAW's handling of his grievance and arbitration was "arbitrary, discriminatory, or in bad faith," such that it "undermined the fairness or integrity of the grievance process." *Landry*, 880 F.2d at 852. The Motion, therefore, must be dismissed.

II.   **Plaintiff has submitted no evidence establishing that Lear breached the collective bargaining agreement.**

Even assuming, for purpose of argument only, that Plaintiff has established a breach of the duty of fair representation, Plaintiff's Motion to vacate must still fail, because he has not produced any evidence establishing a breach of the CBA or any other basis for vacating the arbitration award.

Judicial review of a labor arbitration award under Section 301 of the LMRA is "very limited." *Major League Baseball Players Assoc. v. Garvey*, 532 U.S. 504, 509 (2001); *see also*, *McNair*, 768 F.2d at 735 ("when an arbitration decision is attacked by the union or the employer, the scope of judicial review is extremely limited"). Courts may not "review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement." *Garvey*, 532 U.S. at 509. "So long as the arbitrator's decision 'draws its essence from the collective bargaining agreement' and the arbitrator is not fashioning 'his own brand of industrial justice,' the award cannot be set aside." *Delta Queen Steamboat Co. v. District 2 Marine Eng'rs Beneficial Ass'n*, 889 F.2d 599, 602 (5th Cir.1989)(quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987)). This is true even if a court is convinced the arbitrator "committed serious errors." *Garvey*, 532 U.S. at 509. Thus, when "an arbitrator resolves factual disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's 'improvident, even silly, fact finding' does not provide a basis for a reviewing court to refuse to enforce the award." *Id.* (quoting *Misco*, 484 U.S. at 39).

Here, Plaintiff has not alleged that Arbitrator Fagan's decision failed to draw its essence from the CBA or that he engaged in his own industrial justice. Plaintiff has not even alleged that Lear breached the CBA when it discharged him (or identified the provisions it violated), let alone submitted any evidence proving such a breach. Nor could he. First, at the hearing, Arbitrator Fagan correctly placed the burden on Lear to prove that it had just cause to discharge Plaintiff.[4] (Appx. at 9). Second, Lear submitted ample evidence to support Arbitrator Fagan's conclusion that "two (2) altercations took place February 17, 2011 . . . [the] second altercation resulted in injuries requiring hospital treatment for both employees. The Grievant [Plaintiff] initiated the first altercation, and actively participated in the second altercation." (Appx. at 253). For example, at the hearing, Plaintiff and Robertson admitted that on February 17, 2011, they got into two altercations, and that the second altercation resulted in serious injuries to both of them. Additionally, Hawkins corroborated Robertson's testimony that Plaintiff choked Robertson during their initial altercation, and Watkins and Price, testified that during the second altercation, they heard Robertson ask Plaintiff if he was trying to stab Robertson, and Hawkins testified he saw a knife lying on the ground. Further, Lear's management witnesses, Brueckner and Luxton, testified about the steps they took to investigate the two altercations, and the reasons behind Lear's decision to discharge Plaintiff and Robertson. In addition to the testimony of the witnesses, Lear supported its case with various documentary exhibits, including investigatory records and pictures of Robertson's stab wounds. Third, in reaching his decision, Arbitrator Fagan applied a rigorous, 7 factor arbitral standard for determining whether an employer had just cause to discharge an employee. Thus, Arbitrator Fagan's decision drew its essence from the

---

[4] The CBA permitted Lear to discharge employees for "cause." (Appx. at 261). The CBA also gave Lear the management right to "establish shop rules." *Id.* The shop rules promulgated by Lear prohibited "[f]ighting on the premises at any time." (Appx. at 293).

Troy_712143_1

CBA, and he did not engage in his own brand of industrial justice when he concluded that Lear had cause to discharge Plaintiff.[5]

Instead of addressing whether the decision drew its essence from the CBA, Plaintiff has attacked Arbitrator Fagan's integrity with nothing more than conclusory allegations devoid of any factual or evidentiary support. Specifically, in Paragraphs 7(a) & (b) of his Motion, Plaintiff asserts that the award was "procured by corruption, fraud, or undue means," and that there is "evidence of partiality or corruption by the arbitrator," because Arbitrator Fagan and UAW representative Brown allegedly "agreed to have plaintiff's National Labor Relations Board complaints dismissed in order to facilitate a biased and apparently corrupt Arbitration proceeding." For the reasons discussed in Argument Section I, the NLRB's February 26, 2013 letter on which Plaintiff solely relies in no way supports his specious allegations of fraud and corruption by Arbitrator Fagan. As discussed, that Letter addressed the ULP Charge that Roberson filed more than eight months before the February 2011 altercations.

Finally, Plaintiff has alleged that Arbitrator Fagan was "guilty of misconduct of misbehavior that prejudiced the rights of Plaintiff," because Arbitrator Fagan allegedly "utilized clearly inadmissible evidence of plaintiff's prior employment history with Lear that was 'more prejudicial than probative.'" (Pl.'s Mot. at ¶ 7(c)). Plaintiff's attempt to impose the requirements of FRE 403 is misplaced. "Federal courts do not superintend arbitration proceedings. Our review is restricted to determining whether the procedure was fundamentally unfair." *Teamsters, Local Union 657 v. Stanley Structures, Inc.*, 735 F.2d 903, 906 (5th Cir. 1984); *see also, Bell Aerospace*

---

[5] The closest Plaintiff comes to addressing whether the decision drew its essence from the CBA is in Paragraph 7(d) of his Motion. In that Paragraph, Plaintiff alleges that Arbitrator Fagan exceeded his powers, because he "erroneously interpreted the use of inflammatory and incomplete testimony in issues in order to award against plaintiff in violation of the arbitration proceedings." Plaintiff has not identified a single erroneous interpretation. He

*Co. Div. of Textron v. Local 516*, 500 F.2d 921, 923 (2nd Cir. 1974)(in making evidentiary determinations, an arbitrator "need not follow all the niceties observed by the federal courts"). The admission of Plaintiff's past disciplinary record was not "fundamentally unfair." In discharge arbitrations, Unions will often argue that mitigating factors, such as an employee's lengthy seniority or good disciplinary record, warrants a reduction in the penalty. *See* F. Elkouri & E. Elkouri, *How Arbitration Works* 15-63 (7th ed. 2012) (Appx. at 421-427). "Indeed, the employee's past record often is a major factor in the determination of the proper penalty for the offense." (Appx. at 422). Thus, Plaintiff's past disciplinary history was relevant on the issue of whether mitigating factors warranted a reduction in the discharge penalty. Further, nothing in the CBA precluded the introduction of Plaintiff's past disciplinary record. The CBA only prevented Lear from utilizing disciplinary action that was older than 12 months "for progression in the normal disciplinary process." (Appx. at 264). Thus, Arbitrator Fagan's decision to admit evidence of Plaintiff's past disciplinary record was not "fundamentally unfair."

## CONCLUSION AND PRAYER FOR RELIEF

For all of the foregoing reasons, Lear requests that the Court deny Plaintiff's Motion to Vacate Arbitration Award, that Lear be awarded its costs of defending this frivolous action, and that the Court award such other relief as it deems appropriate.

BODMAN PLC

/s/ Christopher P. Mazzoli (P51417)
Attorneys for Defendant Lear Corporation
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000 - Telephone

---

also has not identified the "inflammatory and incomplete testimony in issues" to which he is referring. And, as with the rest of his Motion, Plaintiff has not submitted any evidence to support his conclusory allegations.

Troy_712143_1

(248) 743-6002 - Facsimile
cmazzoli@bodmanlaw.com

and

/s/ Patricia A. Nolan (15062550)
Co-Counsel for Defendant Lear Corporation
700 N. Pearl Street, Suite 1610
Dallas, Texas 75201
(325) 725-4417 - Telephone
(325) 725-9409 - Facsimile
pnolan@nolanfirm.cm

Troy_712143_1

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2013 a true and correct copy Defendant Lear Corporation's Brief in Opposition to Motion to Vacate Arbitration Award has been electronically filed with the Clerk of the Court using the ECF filing system which will serve a copy of said document upon the attorneys of record.

/s/ Christopher P. Mazzoli, Esq.